LANDER v. ZIEHR et al., Appellants.

· Division Two, June 6, 1899.

150　403
164　164
150　403
167　510
150　403
100a ³113

1. **Conveyance:** VOLUNTARY: DEED BY HUSBAND TO WIFE OF HOME-
STEAD. A voluntary deed by a husband to his wife without any
pecuniary consideration moving from the wife, is void as to all
existing creditors of the husband.

2. ————: ————: INHERITED PROPERTY. And where it is shown that
the property was inherited by the husband, or acquired by his means
during coverture, a voluntary conveyance thereof to the wife is
fraudulent in law.

3. ————: ————: SUBSEQUENT CREDITORS. And where such convey-
ance is prompted by an intention to contract debts, and by a design
· by such conveyance to avoid the payment of such debts, the deed is
void as to subsequent creditors. And this fraud may be shown by a
proof of prior debts, the insolvency of the grantor at the time of the
conveyance, or though solvent that he was rendered insolvent
thereby, or by anything which shows a purpose to hinder, delay or
defraud those to whom he is about to become indebted.

4. ————: ————: ————: RECORD OF CONVEYANCE. And where a
banker in a town other than the county seat did not know of any such
conveyance, although the deed had been recorded, and on the appli-
cation of the grantor to borrow money to be used in the building of
an artificial ice house the banker told him he would not loan money
on an unfinished building, but would take as security a deed of trust
on his residence and saloon property (the real estate described in the
conveyance to his wife), and to this the grantor assented, but said
he wanted to get the money along as needed from time to time and
when he had drawn the full amount he would secure it as desired,
and on the strength of these representations and his apparent owner-
ship of the property and the fact that he had held himself out to the
world as the owner long after the transfer, the banker from time to
time advanced him the amount agreed on and then asked for the
promised security, and was postponed from time to time on the plea
of pressing engagements and then on the plea that his wife would not
sign the mortgage, and then when the banker offered to take the
mortgage without her signature he was first informed by the debtor
that the property was in his wife's name, it will be held that the
record of the deed did not relieve it of its fraudulent character.

Lander v. Ziehr.

5. ———: ———: ———: CHANGING CREDITORS. A mere change of creditors while the debt continued will not relieve against the fraud; in other words, if the grantor pays off debts existing at the time the conveyance was made by borrowing an equal amount of money from subsequent creditors, the conveyance will be void as to them also. Especially will this be the case, where the other evidence makes out a case of actual, intentional fraud.

6. ———: RENTS AND PROFITS: PRAYER FOR GENERAL RELIEF. Where the conveyance is held to be fraudulent, and the petition contains a prayer for general relief, the rents and profits of the property should be adjudged to belong to the creditors who bring the suit to set aside the deed.

*Appeal from Linn Circuit Court.*—HON. W. W. RUCKER, Judge.

AFFIRMED.

CHAS. K. HART, M. M. CRANDALL and A. W. MULLINS for appellants.

(1) The deed of conveyance made and executed by Ziehr to his wife, on December 22, 1891, and recorded March 17, 1892, was and is sufficient in equity to convey to and vest in her the equitable right and title to the real estate in question. Wood v. Broadley, 76 Mo. 23; Woodsworth v. Tanner, 94 Mo. 124; Turner v. Shaw, 96 Mo. 22; Pitts v. Sheriff, 108 Mo. 110; Crawford v. Whitmore, 120 Mo. 144; Sackman v. Sackman, 143 Mo. 585. (2) The deed from Ziehr to his wife, did not in anywise affect any creditor to whom he was then indebted. Ziehr's then existing indebtedness was soon thereafter paid, except as to $450 secured by deed of trust on real estate more than sufficient to pay off that debt, and with respect to which indebtedness no holder thereof has ever complained. Aside from the property Ziehr conveyed to his wife by this deed, he owned property worth $3,500 and his indebtedness at that time amounted altogether to only about $1,300. Such being

his financial condition he had the legal, equitable and moral right to make such provision for his wife (and for their infant children) as he attempted to make by the said deed. Updegraff v. Theaker, 57 Mo. App. 45; Wood v. Broadley, 76 Mo. 23; Frank v. Caruthers, 108 Mo. 569; Mittelburg v. Harrison, 11 Mo. App. 136; s. c., 90 Mo. 444; Bump on Fraud. Convey., 275 and 276; Walsh v. Ketchum, 84 Mo. 427; Sexton v. Wheaton, 8 Wheat. 227; Mattingley v. Nye, 8 Wall. 370; Payne v. Stanton, 59 Mo. 158. (3) The deed from Ziehr to his wife, dated December 22, 1891, and recorded March 17, 1892, was notice to all persons of the equitable rights of the wife in and to the property in question. Mueller v. Kaessmann, 84 Mo. 329; Woodsworth v. Tanner, 94 Mo. 129; Digman v. McCollum, 47 Mo. 372; Bank of Albion v. Burns, 46 N. Y. 170; sections 2418 and 2419, R. S. 1889. And the rights of Mrs. Ziehr to the property in question were vested and fixed by the deed from her husband to her, and he could do nothing thereafter to impair them. Mattingley v. Nye, 8 Wall. 375; Sexton v. Wheaton, 8 Wheat. 241. (4) There is no sufficient allegation in the plaintiff's petition to support that part of the decree of the court adjudging that the defendant, J. H. Gordon, pay to the plaintiff, Harry Lander, the sum of $550, "rents retained by him and accruing since the execution of the sheriff's deed to the plaintiff herein." (5) The real estate in question having been given by Ziehr to his wife, she became, from the time of the conveyance to her, entitled to the rents and profits derived from said real estate with full power to use said property or dispose of its rents as she saw fit, to the same extent as though it had come from any other source. And Ziehr exercising control and using the rents did not change or affect her rights. Section 6868, R. S. 1889; Gilliland v. Gilliland, 96 Mo. 522; Gitchell v. Messmer, 87 Mo. 131; Cooper v. Standley, 40 Mo. App. 138.

Lander v. Ziehr.

J. M. JOHNSON, J. A. ARBUTHNOT and S. P. HUSTON for respondent.

(1) Gifts and grants of property by the husband to the wife during marriage are void at law. Crawford v. Whitmore, 120 Mo. 144. Where, however, there appears a solid equity back of the transfer, courts of chancery will uphold such conveyance, not as a matter of course, but only when according to the principles of equity it is a matter of conscience and right to give effect to the deed. Thus it will be sustained where the wife was a creditor of the husband, or had paid the purchase price. Woodsworth v. Tanner, 94 Mo. 124; Story's Eq. Jur., sec. 1374; Pawley v. Vogel, 42 Mo. 303. (2) The conveyance was voluntary, and therefore the *quo animo* of the grantee is immaterial— the motive or purpose of the grantor alone is to be considered. Bump on Fraud. Conv. (3 Ed.) 68. The law protects the innocent purchaser, not the innocent donee. Under the evidence in this case the conveyance by Ziehr to his wife was intended and used as a conveyance to his use. If the conveyance had in terms provided that Ziehr should have and retain and use the usufruct of the property it would have been void on its face as a conveyance to his use. R. S. 1889, sec. 5169. (3) If the proof is such that it might reasonably be inferred that such was the secret understanding of the parties, then the conveyance is equally void as if it had been written in the instrument. Bank v. Powers, 134 Mo. 446; Robert v. Barnes, 127 Mo. 405; Donivan v. Dunning, 69 Mo. 436; Benne v. Schnecko, 100 Mo. 250. A secret trust to the use of the grantor is a continuing fraud. Bump on Fraud. Convey. (3 Ed.), 214; Snyder v. Free, 114 Mo. 360. (4) The subsequent acts of the parties in reference to the property was admissible as bearing on the intent with which the conveyance was made. Bump on Fraud. Conv. (3 Ed.),

590.   (5)   If the conveyance was fraudulent and therefore void the rents and profits which are mere ownership went with it.   It certainly is not consonant with the principles of law that the grantee should derive any advantage from his fraud; he may be compelled to account for the profits from the time of the transfer.   Bump on Fraud. Convey., 612; Mead v. Coomb, 19 N. J. Eq. 112.   In this case the rents were impounded from and after the conveyance under execution by demand and notice from Judge Lander to the tenant, for all previous time Ziehr had collected and appropriated it to his own use.   The petition contains a prayer for general relief. The answers of the Ziehrs set up the matter of the rents held by Gordon, and asked a decree for their payment.   This matter was fairly before the court and having jurisdiction it proceeded to do complete equity between the parties.

GANTT, P. J.—This is an appeal from a decree of the circuit court of Linn county adjudging certain conveyances of the defendant, John Ziehr, to his wife, Emma Ziehr, and to Judge W. H. Brownlee as trustee for her, to be fraudulent and void.

The trustee is a mere formal party and has no interest in the cause save as the holder of the legal title.

One of the deeds purports to have been made by John Ziehr to his wife on December 22, 1891, and recorded March 17, 1892, and conveys the residence of John Ziehr in Brookfield and a brick building known as his saloon property, for the consideration of love and affection.   The other deed, made long after the levy of the attachment, and long after the accruing of the debts for which the property was sold, was to W. H. Brownlee, as trustee, for Mrs. Ziehr, and was recorded February 23, 1895.

John Ziehr inherited the said real estate from his father in 1890.   Previous to this time he and his brothers, George and William, were in partnership in the coal, wood, beer and ice business in Brookfield, and also engaged in draying.   He

was married to his codefendant, Emma Ziehr, in 1889. She brought him no property and was possessed of none in her own right. In 1890 he received as his share of his father's estate a residence worth three thousand dollars; the saloon property worth six thousand dollars and an ice-house worth about $500. In the partition of the property the defendant John Ziehr obligated himself to his mother, brothers and sisters to the amount of seventeen hundred dollars, and to secure one of the brothers $450 mortgaged the ice-house for that sum, and subsequently sold it for thirty-five dollars subject to that mortgage. To liquidate the claims of the others he made an overdraft of $800 on the Bank of Brookfield and continued to owe his mother $200 in 1892.

Outside of the foregoing real estate John Ziehr owned some personal property, several horses and mules, drays and personal effects, all of which was afterwards sold under a chattel mortgage for three hundred and fifty dollars. He was a partner in a saloon and obtained $320 for his share therein in January, 1892. He testified, however, that he kept $500 in money on hand at his home as "a reserve." He testified also to book accounts due him to the amount of seven hundred and fourteen dollars, but on cross-examination it appeared these were so largely offset by counter accounts of merchants and others to whom he was indebted, that they could scarcely be called assets.

After the dissolution with his brothers, John Ziehr, the defendant, continued in the ice, coal and beer business alone, and it was soon apparent that his brothers were selling better ice than he was and he began to look about for an artificial ice plant.

He had little or no capital invested in his business at this time. He bought coal and beer on time and relied on selling it to meet his payments. No one from his evidence can approximate what his real financial condition was for several years. He says he was making money but the result demon-

strates that he was either mistaken or has secreted his property. He owed the coal men and the brewing company of whom he bought, considerable money, and he made them payments, but it appears that when he paid them he increased his indebtedness to the Bank of Brookfield which permitted him to overdraw on the faith of his ownership of property.

The evidence does not show the exact date of the delivery of the deed he made directly to his wife and which bore the date of December 22, 1891, but it does appear that between that date and its record, March, 1892, he was indebted to the Bank of Brookfield from seven hundred to one thousand dollars which debt was a running account and increased from time to time until the spring of 1894, when it reached $2,400, and has never been paid. On the 22d of December, 1891, he owed Anheuser-Busch $137 and this sum increased to $460, before the record of the deed in March, 1892. The indebtedness increased until the spring of 1894, when it amounted to $1,800, and has never been paid. This business was done at Brookfield and these creditors did not know that he had put to record the deed to his wife, at Linneus, the county seat. It is entirely clear that this credit was extended to him on the assumed ownership of the dwelling house and saloon property.

The evidence of his partner, Gordon, tends to establish that in October, 1891, John Ziehr conceived the plan of erecting an artificial ice plant which he ascertained on a visit to St. Louis would cost $20,000. With this purpose in view he conveyed the only available real estate he had to his wife and by this deed practically rendered himself insolvent. After making this deed he continued to be the ostensible owner of this real estate as if it was his own. He gave it in to the assessor for 1891, 1892 and 1893, as his own. He.paid the taxes out of his own money, insured it in his own name, and paid for the insurance out of his own funds to the local agency in Brookfield. Gordon, his tenant, knew nothing of the transfer,

and continued to pay him the rent monthly, and John Ziehr receipted him in his own name therefor. He says himself he used these rents in his own business and never paid his wife a cent. He kept no account of it with her. He contracted for expensive improvements and paid for them out of his own money. In 1894 for the first time he caused the property to be assessed to his wife and had it insured in her name, and never until pressed by DeGraw, who had loaned him $6,000, did he state that the property belonged to his wife. In the meantime he had become indebted to the amount of thirteen thousand dollars.

When he and Gordon went to DeGraw to borrow of him $6,000, DeGraw told them that he would not take security on any unfinished building like the ice plant, but would advance the money and take as security his saloon property and other property. When this statement was made, John Ziehr assented, and did not by word or deed indicate that he did not own the property, but said that they wanted to get the money along from time to time, as they needed it, and when he got the full amount of $6,000 he would secure it as desired. Ziehr was regarded as the responsible party, and according to the evidence it was fairly understood between DeGraw, Ziehr and Gordon that Ziehr was to secure the $6,000 by deed of trust on his saloon property and other property sufficient to make ample security. This was in the spring of 1894. And on the strength of these representations and his apparent ownership of this substantial property, DeGraw, through Linn County Bank, from time to time advanced to Ziehr and Ziehr & Gordon $6,000, and when security was asked by De-Graw on the saloon property as promised, John Ziehr pleaded business engagements from time to time, but promised to give the security and have it fixed up as soon as possible, and when pressed by Arbuthnot, acting for Bank of Brookfield and DeGraw, he claimed that his wife objected to signing the deed of trust. These pretexts and excuses by Ziehr continued

for sometime, and when at last DeGraw and Arbuthnot proposed to accept the deed without the signature of his wife he could "trim" no longer and announced to them "that his property was in his wife's name." So, with the debt of the Anheuser-Busch Brewing Company, it was created and the credit given to him on the faith of his ownership of these two pieces of property. He had no other tangible property available to creditors.

John Ziehr's claim on the trial that he was solvent until the spring of '94 when he commenced the construction of the ice plant and that he lost his wealth in the ice plant venture is completely exploded by a consideration of the record in this case. He only claims to have invested in the ice plant $3,500 in all. Gordon says he invested only $3,300, including the work he did and his draying.

He got from the Bank of Brookfield..............$ 2,400
From Anheuser-Busch ........ .............. ....    1,846
From Linn County Bank........ ..............  ....    1,000
                                                  ─────────
          Making a total of.................... ....... $ 5,200

This sum of $5,200 he got personally. This sum is aside from the $5,000 got by Ziehr & Gordon from DeGraw and is aside from the $2,000 or $3,000 debts contracted by Gordon & Ziehr and their indebtedness to Fred W. Wolff for machinery. He claims that his dray, ice, coal and beer business was profitable, that he was making money all this time, but according to his own statement he only claims to have invested in the ice plant $3,500 of his own individual money. This would leave him a net reserve of the money obtained by him of Bank of Brookfield, Anheuser-Busch and DeGraw alone between one thousand seven hundred dollars to two thousand two hundred dollars, individually to himself.

Suits were brought by the Anheuser-Busch Company against John Ziehr for $1,846 and the Linn County Bank for the sum of $5,000. The Bank of Brookfield and also the

Linn County Bank had also brought suits by attachment against Ziehr for $2,400 and $1,000 and interest, both of which last mentioned suits were transferred to the Sullivan County Circuit Court on the application of the defendant, John Ziehr.   Under these attachments the property described in the petition had been levied upon, and the same property was levied upon and sold under the judgments obtained by Anheuser-Busch Brewing Company and Linn County Bank above mentioned in the Linn County Circuit Court, and at the sheriff's sale of said property by agreement of all these creditors the respondent, Harry Lander, became the purchaser of the property described in the petition for the benefit of all these creditors, and he thus prosecutes this suit.

As already stated the circuit court rendered a decree that the deed to the homestead was not fraudulent, but that to the saloon property was void as to his creditors, and confiscated the rents paid by Gordon after the attachment.

It is to reverse that decree this appeal is prosecuted.

I.   The deed from John Ziehr to his wife Emma, of date December 22, 1891, on its face declares the consideration therefor was only love and affection, and was therefore a pure gratuity, but in addition to this recital it is made entirely clear that the wife had in no way contributed to the acquisition of this property.   She had only been married to defendant John Ziehr about two years when the deed was executed. She brought him no estate whatever by her marriage, being entirely without means.   This property was not the product of the joint savings or labor of John Ziehr and his wife, but was inherited from his father.   Being voluntary and without any pecuniary consideration moving from the wife, it was void as to all existing creditors of John Ziehr.   [Jordan v. Buschmeyer, 97 Mo. 94.]

It having been shown and conceded that the deed was made to the wife of property inherited and acquired by his means during coverture the transaction as to all existing

creditors was fraudulent in law. [Patton v. Bragg, 133 Mo. 595; Bump on Fraudulent Conveyances (2 Ed.), p. 200.]

The case presents no feature which requires a court to uphold the deed in equity though it was void at law. [Woodsworth v. Tanner, 94 Mo. 124.]

While the deed was fraudulent at law because voluntary as to existing creditors, it has long been held in this State that a voluntary conveyance as to subsequent creditors, although the party be indebted at the time of its execution, is not fraudulent *per se* as to them, but the fact whether it is fraudulent or not is to be determined by all the circumstances. [Pepper v. Carter, 11 Mo. 542; Payne v. Stanton, 59 Mo. 158; Frank v. Caruthers, 108 Mo. 569.]

What then are the circumstances which would justify a court in holding a conveyance fraudulent as to subsequent creditors? The proof of prior debts, the insolvency of the debtor at the time of the conveyance or though solvent rendered insolvent by the conveyance he makes; a design or purpose to hinder, delay or defraud those to whom he is about to become indebted, are some of the marked *indicia* of fraud. In a word, an intent to contract debts and a design to avoid the payment of such debts by the conveyance. It was pointed out by this court in Snyder v. Free, 114 Mo. 360, that the statute simply requires "an intent to defraud" to be shown. Applying these tests to the facts of this case, and we have a grantor, not only indebted at the time of the conveyance, but that conveyance confessedly gratuitous and voluntary of all the property to which creditors would naturally look for the payment of their debts. That conveyance is kept off of record for three months. It is true that this deed was afterwards recorded at the county seat, but it must be borne in mind that John Ziehr lived in Brookfield and the property was all there, and that he continued to use it and control it just as he always had, and that as a matter of fact it was not

suspected by DeGraw when he loaned him six thousand dollars that the property was in the wife's name. It requires no corroborative evidence to demonstrate that DeGraw or any other prudent investor would not have loaned John Ziehr six thousand dollars had he known that the very property on which he was to be secured was in Ziehr's wife's name. Nor did the record of this deed under the circumstances relieve it of its fraudulent character. [Bump on Fraud. Conv. (4 Ed.) sec. 293, and cases cited.]

Much stress is laid by counsel for defendants upon the fact that the items due the Brookfield Bank at the date of the conveyance were afterwards paid, but as to this contention we answer that a great deal depends upon the mode in which this is done. Proving that prior debts have been paid amounts to nothing, if, as in this case, it appears Ziehr was contracting other debts to an equal amount. Any other rule would simply permit a debtor to take the property of subsequent creditors and give it to his grantee. A mere change of creditors while the debt continues, will not cheat the statute. [Bump on Conv. (4 Ed.), sec. 296, and cases cited; Brown v. McDonald, 1 Hill's Ch. loc. cit. 304; Taylor v. Coenen, 1 L. R. Ch. Div. 636; Madden v. Day, 1 Bai. (S. C.) loc. cit. 340, 341; Antrims v. Kelly, 4 Nat. Bankruptcy Reg. 189.] That John Ziehr kept up his credit by paying old debts with the proceeds of goods purchased and overdrafts from time to time we think is abundantly established.

But that this evidence makes out a case of actual, intentional fraud, can scarcely be questioned. John Ziehr had learned that an ice plant would cost him nearly or quite $20,000. He knew he had no other property on which he could possibly expect a loan to erect so costly an establishment, except his real estate. His subsequent conduct convicts him of a deliberate purpose to defraud. He testifies himself that aside from this property in dispute he had nothing at all, because the $3,500 which he attempts to say he had has van-

ished and left not a trace behind. When he came to DeGraw to borrow the money he permitted DeGraw to believe he still owned the saloon property. He admits DeGraw told him he would not take a lien on the ice plant. Indeed at that time he did not even own the land on which it was later constructed.

It is absolutely incredible that DeGraw would have considered the loan at all if he had not supposed Ziehr owned the saloon property, as he had nothing else with which to secure DeGraw.

He was exercising every *indicia* of ownership. When he told DeGraw he would give him ample security he knew he had nothing but this property. His shuffling and procrastinating when DeGraw required the deed of trust which he had promised to give are in harmony with his deception throughout.

Without recapitulating all the evidence it is sufficient to say that it would be against all reason and conscience to permit John Ziehr, through his wife, to continue to enjoy this property as he has from the execution of the deed, after having contrived to obtain the money of his creditors to a large amount on the faith of his ownership, and cover it up in his wife's name when she had not invested a farthing in it. The courts of equity can not countenance a scheme like this.

The circuit court properly found that it was John Ziehr's property when it was attached and sold and that plaintiff as the trustee of an express trust had a right to have the deeds to his wife canceled and held for naught, and under the prayer for general relief, the rents and profits were properly adjudged also to plaintiff for the creditors.

The decree is affirmed. SHERWOOD and BURGESS, JJ., concur.